626 A.2d 620

Linda MARSHALL, Parent and Natural Guardian of Edward Marshall, A Minor and Linda Marshall In Her Own Right

v.

PHILADELPHIA TRAMRAIL CO., Appellant.

Superior Court of Pennsylvania.

Argued Dec. 10, 1992.

Filed June 16, 1993.

Austin Hogan, Philadelphia, for appellant.

Stephen M. Feldman, Philadelphia, for appellee.

Before CAVANAUGH, BECK and POPOVICH, JJ.

CAVANAUGH, Judge.

This appeal arises from a verdict in favor of the appellee in the amount of $807,000.00 plus $416,130.09 in delay damages. The appellant raises several arguments on appeal. We find merit with the appellant's claim that the trial court erred by instructing the jury a product must be "safe for use" as opposed to "safe for intended use." We reverse, and remand for a new trial.

On January 12, 1985, the appellee, Edward Marshall, suffered injury in the course of his employment as a stock boy for Shop N' Bag. At the time, the appellee was a seventeen-year-old high school senior who worked part time at the store. His duties entailed collecting used cardboard boxes and placing them into an industrial size trash compactor/baler. The boxes would then be squeezed into a manageable compact unit by a hydraulic ram which descended on the cardboard. After the cardboard was compacted, the ram would return automatically to its starting place at the top of the machine. It is while operating the compactor/baler, a machine designed and manufactured by appellant Philadelphia Tramrail Company, that the appellee suffered injury during an accident. As a result of the accident, appellee received serious injury to a portion of his right hand, and a less severe injury to fingers on his left hand.[1]

The tenor of the appellant's defense at trial was that the compactor/baler was not shown to be defective by the appellee, whose injury appeared to have resulted from an ill-considered override of the machine's safety features. On appeal, several of appellant's arguments continue to resonate

[1]. On appellant's right hand, the middle phalanges of the index and middle fingers were seriously fractured, the flexor and extensor tendons of those fingers were severed, he suffered extensive nerve and blood vessel damage to those fingers, and he lost extensive palmar surface on his right index finger. On appellee's left hand, the flexor tendons of the index and middle fingers were severed.

these themes. This being the case, we think it important to set forth at some length the parties' presentation of their cases as to the machine's alleged defectiveness at trial.

The appellee at trial sought to prove the machine was defective by his own testimony recounting how the accident occurred, and by his expert's testimony indicating how the machine was defective.

The appellee testified that his employer told him that there were two steps in using the machine. Each step required use of the machine in a different fashion.

The first step involved getting enough cardboard into the compactor/baler in preparation for making a bale. During this step, the appellee would alternately place several cardboard boxes into the machine and crush them by operating the machine. He would repeat this process until there was enough cardboard in the machine to make a bale. Markings on the side of the machine told the user the appropriate level for making a bale. The appellee testified he was told by a co-worker that the proper way to operate the machine during this step was in the *automatic mode* with the safety gate of the machine *open*. He was instructed that during this step, he was to depress a lever and at the same time to press the start button. The ram would proceed down from the top of the machine and crush the cardboard. He was told the reason that boxes were crushed in this way was because having the gate open allowed a stock boy to crush boxes quicker. The appellee was also told that he was to utilize this procedure to clean cardboard from the top of the ram.

The second step involved actually making the bale. As the appellee was injured using the compactor/baler as expressed above, an in-depth recitation of the process is unnecessary to our analysis. Generally, the idea was to further compact the boxes into a compressed unit and then tie the unit up with wire and eject it. The appellee was told, quite pertinently, that when he made a bale during this step, the machine was to be operated with the *gate down*. He was to switch the machine from *automatic mode* to *manual mode*. He was then

to press the button down until the cardboard was sufficiently compacted to make a bale. When this was done, as the controls were on manual, the ram would be holding the cardboard down. While the ram held the cardboard in place, he would tie the unit with wires into a bale. He would subsequently, using the *manual mode* button, raise the ram. The bale would be ejected in a method not altogether clear from the record.

The appellee testified that the accident scenario arose during the first step. Although the ram was pushing down most of the cardboard, some of the cardboard started to build up along the edges, particularly in the back. The appellee stated that from experience, he knew that if the cardboard built up in the back of the machine, the machine would not operate properly and go through its proper cycle. Therefore, he had to clean it out. Although no one had instructed him precisely how to clean out cardboard that had accumulated in the back of the machine, the appellee stated he took the knowledge he learned from the instructions he learned in "step one" and applied it to this situation. He had previously depressed the gate limit lever with his left hand and pushed the start button with his right hand while the gate was open. As the machine finished the crushing cycle, he released the gate limit switch and he climbed onto the machine, placing his left foot on one rail of the machine a foot off the ground, and he placed his right foot on another rail about a foot above. With the rails providing him easier access into the machine, the appellee leaned over the ram and attempted to move the cardboard out of the way with both hands. Although highly pertinent, the record is unclear whether the appellant knew the ram was ascending at this point. However, ascending it was, and the ram caught several of appellees fingers against a part of the upper end of the machine. His injuries were as aforesaid.

Appellee's liability expert, Mr. Simon Tamny, opined that the baler was defective and not safe for use. The tenor of his testimony is that the machine's safety features should have prevented the appellee from either accessing the inside of the compactor/baler or from having his body parts caught in the

ram's upswing. First, the expert claimed that the machine was defective because of the faulty placement of a proximity switch which allowed the safety gate to be open. The placement of the proximity switch was such that if the safety gate was bent or bowed, the proximity switch would send a false signal allowing the baler to operate with the safety gate in the open position. He stated that if cardboard became jammed between the top of the machine and the top of the ram, it would cause the gate to bow outward. Second, the expert also testified that the placement of angle irons at the top of the front of the ram was unnecessary, creating an extra pinch point. Finally, he felt that the gate limit switch was too accessible and promoted tampering.

Pertinent to this disposition, the appellant had two basic theories of the case, both involving a foolhardy risk on the appellee's behalf. The appellant noted that instructions on the side of the baler/compressor read "To compress material, set manual-auto switch to auto, pull gate down" and "To bale. Set manual-auto switch to manual. Set up down switch to down. Pull gate down." Appellant's first theory is that despite these instructions, the appellant's own testimony indicated he climbed onto the machine's cross members in order to reach across the ram to unjam cardboard in the rear of the machine. This involved prostrating his body between the ascending ram and the baler, a highly dangerous maneuver and not within the machine's intended use. His second theory was that the uniform nature of the appellee's injuries to his fingers indicated that the appellee may have been hanging on the ram as it ascended. The apparent motivation of doing this would simply be for the experience of taking a ride. The court allowed both theories to be argued to the jury in appellant's closing argument.

Appellant raises several arguments on appeal. We have reviewed these arguments, and we find merit with appellant's argument that the court erred in the case *sub judice* by instructing the jury that a product must be "safe for use" instead of "safe for intended use."

During closing arguments, the appellant told the jury that he expected the judge to charge them that in order to be defective, the baler/compactor had to be unsafe for intended use. The appellant repeatedly argued that the compactor/baler was safe for intended use. To the appellant's surprise, in charging the jury, the court in defining what constitutes a defect stated as follows:

[The Plaintiff] alleges that as a result of that defective condition he was harmed and has suffered damages for which he seeks compensation. That's the case before you.

Now, the first issue in the case I think you have to address is whether this was a defective product. The law in Pennsylvania is that a manufacturer or seller of a product is the guarantor of its safety. The product must, therefore, be provided with every element to make it safe for use and must be without any condition that makes it unsafe for use.

If you find that the trash compactor baler, whatever it is you refer it to, lacked any element to make it safe for at the time it left the defendant Philadelphia Tramrail Corporation's control or contained any condition that made it unsafe for use at that time, then the product was defective and the defendant is liable for all harm caused by such a defect.

The seller is liable for all harm of which its defective product is a substantial cause whether such harm is to the purchaser, to a user, to a consumer or to a bystander. The seller by placing the product into the stream of commerce is responsible to all who come within the boundaries of its use. And I repeat, the seller is responsible for providing a product which has every element to make it safe and without any condition to make it unsafe. That's his duty. That's a non-delegable duty. We say it's a duty you can't transfer to someone else. And it does not matter if the bystander was careless. Negligence is no defense. Negligence of the user is no defense. If it was defective when it left the control of Philadelphia Tramrail Corporation, then if you find it was defective, than you have to go on and make a judgment whether the defect was a cause of harm to Mr. Marshall ...

After the full jury instructions were concluded, the appellant protested to the court that this jury instruction was in error. The following exchange occurred:

MR. HOGAN: Your Honor, you referred to a product being safe for use but not safe for intended use.

THE COURT: That's right.

MR. HOGAN: Is that deliberate?

THE COURT: That was quite deliberate.

MR. HOGAN: Okay. Note my exception. That is the language of *Azarella* [sic].

THE COURT: Yes.

On appeal, the appellant, *inter alia*, argues that the court erred by failing to instruct the jury that a product is only defective when it lacks any element to make it safe for its intended use. The appellant notes that the seminal case in our jurisdiction regarding the question of defect in a strict liability case, *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), speaks in terms of "intended use" rather than simply "use." It notes that several of our subsequent cases refer to the manufacturer's duty to make the product safe for "intended use." *See, e.g., Carrecter v. Colson Equipment Co.*, 346 Pa.Super. 95, 499 A.2d 326 (1985); *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984), *appeal dismissed* 508 Pa. 643, 500 A.2d 428 (1985); *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 467 A.2d 615 (1983). The appellant asserts that the best evidence that Pennsylvania Courts wish to confine a manufacturer's liability to defects defined in terms of safety for "intended use" is the very existence of the defense of unforeseeable misuse. It claims that when the court charge that the product had to be simply "safe of use," it gave the jury the opportunity to conclude that the baler had to be safe for any use, no matter how unintended, reckless, or unforeseeable.

We find the tenor of appellant's argument persuasive. In *Azzarello, supra,* our Supreme Court determined the appropriate form of jury instructions in a products liability case. The Court announced its ruling while determining the ques-

tion of whether, in a products liability case, the jury should be instructed as to whether a product in question was unreasonably dangerous. *Id.* at 551, 391 A.2d at 1023. The Court recognized that Section 402A of the Restatement (Second) of Torts required a product to be "unreasonably dangerous" to be found in defective condition. *Id.* at 551, 391 A.2d at 1024. The Court, however, felt that using the words "unreasonably dangerous" in a jury instruction inappropriately invited the trier of fact to consider matters usually identified with the law of negligence. *Id.* at 555, 391 A.2d at 1025. The Court quoted favorably from a decision by the California Supreme Court:

> The result of the limitation ... [unreasonably dangerous] has not been to prevent the seller from becoming an insurer of his products with respect to all harm generated by their use. Rather, it has burdened the injured plaintiff with proof of an element which rings of negligence. As a result, if, in the view of the trier of fact, the 'ordinary consumer' would have expected the defective condition of a product, the seller is not strictly liable, regardless of the expectations of the injured plaintiff ...

> We recognize that the words, 'unreasonably dangerous' may ... serve the beneficial purpose of preventing the seller from being treated as the insurer of its products. However, we think that such protective end is attained by the necessity of proving that there was a defect in the manufacture or design of the product, and such defect was a [legal] cause of the injuries.

*Id.* at 555, 391 A.2d at 1025, *quoting Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 132–3, 104 Cal.Rptr. 433, 441, 501 P.2d 1153, 1161, 1162 (1972). *Id.* at 556, 391 A.2d at 1025. The Court declared that the words "unreasonably dangerous" have "no independent significance and merely represent a label to be used where it is determined that the risk of loss should be placed on the supplier." *Id.* It felt that the court, rather than the trier of fact, was the competent party in determining whether the product's alleged condition, in the abstract, would justify placing liability on the manufacturer. *Id.* at 558, 391 A.2d at 1026. It reasoned that a court is much better

equipped to determine the social policies involved in determining whether the plaintiff's averments in his complaint merit recovery. *Id.*

Most pertinent to the present appeal, the Court concluded its analysis by declaring:

For the term guarantor to have any meaning in this context the supplier must at least provided a product which is designed to make it safe for the intended use. *Under this standard, in this type of case, the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for intended use or possessing any feature that renders it unsafe for the intended use.* It is clear that the term 'unreasonable dangerous' has no place in the instructions to a jury as to the question of 'defect' in this type of case. We therefore agree with the court .en banc that the use of the term 'unreasonably dangerous' in the charge was misleading and that the appellee was entitled to a new trial.

*Id.* at 559, 391 A.2d at 1027 (emphasis added) (footnotes omitted). The Court declared in its final footnote, footnote 12, as follows:

We believe an adequate charge to the jury, one which expresses clearly and concisely the concept of 'defect,' while avoiding the interjection of the 'reasonable man' negligence terminology, is the jury instruction directed to the definition of a 'defect.' which was fashioned in large part by the Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions, Civil Instruction Subcommittee:

'The [supplier] of a product is the guarantor of its safety. The product must, therefore, be provided with any element necessary to make it safe for [*its intended* ] use, and without any condition that makes it unsafe for [*its intended* ] use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for [*its intended* ] use or contained any condition that made it unsafe for [*its intended* ] use, then the product was defective, and the defendant is liable for all harm caused by such defect.'

Pennsylvania Standard Jury Instruction 8.02 (Civil), Subcommittee Draft (June 6, 1976)

*Id.* at 559–560, 391 A.2d at 1027 (emphasis added).

The Court's pronouncements in *Azzarello* lead to the conclusion that the appropriate jury instruction in the case *sub judice* was that a product is only defective when it is not safe for intended use. The Court repeated the formulation "intended use" *six times in its Opinion.* The Court, although noting that an adequate charge to the jury was contained in Pennsylvania Standard Jury Instruction 8.02 (Civil), Subcommittee Draft (June 6, 1976), while quoting that charge supplemented it with the word "intended" in brackets before the words "use." The Court's addition of the word "intended" in the standard jury instruction, and its declaration in the body of the opinion that "the jury may find a defect where the product left the supplier's control lacking any element to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use," is a clear signal that the Court anticipated its use in products liability cases of this genre.

More significantly, the Court in *Azzarello* established a two-step evaluation of whether a product was defective. First, the court was to make a risk-utility analysis of the plaintiff's averments to determine whether, as a matter of social policy, recovery was permissible. *See Fitzpatrick v. Outboard Marine Corporation,* 424 Pa.Super. 473, 623 A.2d 322 (1993).[2] Next, the jury's role was to determine whether the averments in the complaint were supported by the facts of the case. Assuming that the court, as a matter of social policy, determined that the plaintiff's *averments* stated a remedial loss, the jury would still have to analyze whether the facts bolstered the plaintiff's case. If the jury charge only required a product be "safe for use" rather than "safe for intended use," the jury would have no guidance as to how to determine whether a

**2.** We note that the record contains no indication that such an analysis was undertaken by the lower court. While our prior cases have not explicitly required as of yet an on-the-record analysis, or even a reference that a risk-utility analysis was made, we note that either would facilitate an appellate court's analysis.

product was defective. Liability would be virtually mandated in every case that the judge allowed to go to the jury, despite the *Azzarello* Court's determination that the jury would be allowed to determine the facts of the particular case. While we do not think a jury has to be given the "intended use" instruction under every factual circumstance, surely the instruction should be used where the facts indicate the injured product user may have been the proximate cause of the accident through using the machine in an unanticipated way.

The failure to instruct the jury that a product has to be "safe for intended use" is surely prejudicial. Presently, the evidence suggested that the plaintiff's predicament was caused after he knowingly or unknowingly defeated one of the compressor's safety features. He did this so he could either (1) perform a cleaning maneuver that was highly dangerous[3] or (2) take a ride by hanging on the ram as it was moving upwards. The court, which was solely responsible for passing on the plaintiff's averments in the abstract, could not and did not pass on whether a defect in reality existed or whether the plaintiff's conduct was the proximate cause of the accident. By instructing the jury that the baler had to be "safe for use," the court allowed the jury to conclude that the baler had to contain safety features that would defeat any attempt to use the machine in a highly improper fashion.

We find our ruling supported by the pronouncements in cases subsequent to *Azzarello*. We find particularly instructive the words of Judge Spaeth in our *en banc* decision of *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984):

[T]he jury is not to find liability when the product is unsafe in some way; liability may only. imposed only on proof that

---

**3.** The appellee testified that he literally climbed on the baler/compactor, placing his right foot on one cross member and his left foot on another, so he could clean out cardboard on the *far side* of the machine. While appellee is correct that there is no testimony that he "prostrat[ed] his entire upper body between the ascending ram and the top of the baler," Appellant's Brief p. 29, it is clear that this maneuver exposed parts of his body to risk that the ascending ram would catch them against the top of the baler.

the product lacked any element necessary to make it *safe* for its *intended use.* As the Supreme Court said in *Berkebile v. Brantly Helicopter Company,* 462 Pa. 83, 337 A.2d 893 (1975):

> Thus, the plaintiff cannot recover if he proves injury from a product absent proof of defect, such as developing diabetic shock from eating sugar or becoming intoxicated from drinking whiskey. Neither can plaintiff recover by proving a defect in the product absent proof of causation as where the plaintiff sustains eye injury while not wearing defective safety glasses.

*Id.* at 53, 485 A.2d at 424 (emphasis in original); *see also Carrecter v. Colson Equipment Co.,* 346 Pa.Super. 95, 100, 499 A.2d 326, 329 (1985) (lower court's definition of defective, in jury instruction which tracked *Azzarello's* language of unsafe for intended use, is correct); Am.Law Prod.Liab.3d § 713, p. 23.

Having determined that the lower court erred in this respect, we find a new trial is mandated.

We reverse and remand for proceedings consistent with this decision. Jurisdiction is relinquished.

BECK, J., concurs in the result.