**Donald A. LABELLE, as Personal Representative of the Estate of Christine Lezzo LABELLE, Plaintiff,**

v.

**PHILIP MORRIS INCORPORATED (Philip Morris USA); Liggett & Myers, Inc.; The Brooke Group Limited; and Liggett Group, Inc., Defendants.**

No. CIV.A.2–98–3235–23.

United States District Court,
D. South Carolina,
Charleston Division.

July 5, 2001.

## ORDER

DUFFY, District Judge.

This matter is before the court upon Defendant Philip Morris' Motion for Summary Judgment as to all of Plaintiff Donald Labelle's claims in this action.[1] For the following reasons, the Motion is granted.

The court was advised on July 5, 2001 that Plaintiff and Defendants Liggett & Myers, The Brooke Group, and Liggett Group have reached a settlement. Accordingly this order will not refer to those defendants.

Ronald L. Motley, Frederick Baker Baker, Ness Motley Loadholt Richardson and Poole, Mt. Pleasant, SC, Charles William Patrick, Jr., Jerry Hudson Evans, Richardson Patrick Westbrook and Brickman, Charleston, SC, for Plaintiff.

Paul A. Dominick, Nexsen Pruet Jacobs and Pollard, Charleston, SC, David Brian McCormack, Henry Buist Smythe, Jr., Busit Moore Smythe and McGee, Charleston, SC, Virginia W. Powell, Robert R. Merhige, Jr., Thomas G. Slater, Jr., Douglas W. Davis, Patricia M. Schwarzschild, Hunton and Williams, Richmond, VA, Gregory G. Little, Hunton and Williams, New York, NY, Wade H. Logan, III, Nelson Mullins Riley and Scarborough, Charleston, SC, John Allen Massalon, Wills and Massalon, Charleston, SC, William O Sweeney, III, Sandra Reid Boney, Everett Augustus

## I. BACKGROUND

Christine Labelle allegedly began smoking cigarettes in the summer of 1970 at the age of fourteen. When she began smoking regularly, she smoked Marlboro cigarettes manufactured by Philip Morris. In approximately 1984, Mrs. Labelle switched to Marlboro Lights and then in 1985 or 1986 switched to Merit. Philip Morris manufactured both Marlboro Lights and Merit. In 1987, she again switched, this time to Pyramids, manufactured by Liggett & Myers, and some time in the 1990's she finally switched to Philip Morris' Basics which she smoked until quitting in November of 1996.[2] Mrs. Labelle was diagnosed with lung cancer in November of 1996 and passed away the following February.

---

1. This action is within this court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000. Christine Lezzo Labelle was a citizen and resident of Pennsylvania at the time of her death. Donald Labelle, the personal representative of her estate, is a citizen and resident of South Carolina. Defendant Philip Morris, Inc. is a Virginia corporation with its principal place of business in New York.

2. The parties provide differing versions of when Mrs. Labelle switched from Pyramids to Basics based on conflicting deposition testi-

Donald Labelle filed this action on November 4, 1998. He filed an Amended Complaint on May 11, 1999 asserting wrongful death and survivor claims in (1) strict products liability, (2) fraud/constructive fraud, (3) Pennsylvania Unfair Trade Practices and Consumer Protection Law, (4) negligence/gross negligence, and (5) civil conspiracy.[3] Philip Morris now moves for summary judgment as to all of these claims. In Plaintiff's response to this motion, he withdrew his fraud and constructive fraud causes of action. Plaintiff also acknowledged that any addiction injury claims would be barred by the Pennsylvania statute of limitations given this court's analysis in its May 8, 2000 Order in *Little v. Brown & Williamson, et al.*, C.A. No. 2:98–1879–23, 2000 WL 33957172. Accordingly, those issues are no longer before the court.

## II. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## III. DISCUSSION

As an initial matter, the decedent, Christine Lezzo Labelle, was a citizen and resident of Pennsylvania at the time of her death. It is undisputed that Pennsylvania law applies. A court sitting in diversity "is to rule upon state law as it exists and not to surmise or suggest its expansion." *Harbor Court Assocs. v. Leo A. Daly Co.*,

---

mony by Donald Labelle. Philip Morris asserts that Mrs. Labelle switched to Basics shortly after 1990, (D. Labelle 6/14/99 Dep. at 60), while Plaintiff asserts that his wife did not switch to Basics until early 1996. (*Id.* at 272–73).

**3.** The Amended Complaint reflects the remaining claims after the parties' agreement to withdraw certain claims and defendants, as well as those remaining after this court's March 18, 1999 Order dismissing several claims.

179 F.3d 147, 153 (4th Cir.1999) (quoting *Burris Chemical, Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir.1993)).

## A. Products Liability

 The threshold inquiry in a products liability case is whether there is a defect. *See, e.g., Azzarello v. Black Bros. Co.*, 480 Pa. 547, 391 A.2d 1020, 1024 (1978); *Riley v. Warren Manufacturing, Inc.*, 455 Pa.Super. 384, 688 A.2d 221, 224 (1997); *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 425 (1984). Whether a jury could find that a product has a defect rendering it unreasonably dangerous is a threshold inquiry for the court. *See, e.g., Azzarello*, 391 A.2d at 1026. Thus, *Azzarello* established a two-part evaluation of determining whether a product was unreasonably dangerous. *See, e.g., Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 308 (Pa.Super.Ct.1998); *Marshall v. Philadelphia Tramrail Co.*, 426 Pa.Super. 156, 626 A.2d 620, 625 (1993). First, the court determines if the plaintiff's averments warrant the conclusion that recovery is permissible. *Marshall*, 626 A.2d at 625. When making this determination, the court is to consider such factors as "the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design." *Dambacher*, 485 A.2d at 423 n. 5.[4] Next, the jury determines whether the facts support plaintiff's averments. *Marshall*, 626 A.2d at 625. Specifically, "after the threshold *Azzarello* determination by the court, the jury must determine whether, under the facts, the product, at the time it left the defendant's control, lacked any element necessary to make it safe for its intended use or contained any condition that made it unsafe for use." *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1046 (3d Cir.1997).

Philip Morris challenges Plaintiff's ability to survive summary judgment as he cannot support his claim of design defect because he has failed to show that a safer alternative design for its cigarettes existed. Furthermore, Plaintiff cannot prove causation because he is unable to show that had Mrs. Labelle smoked an alternatively designed cigarette she would not have contracted cancer. Plaintiff correctly

---

4. The *Dambacher* court also cited the following factors which may be considered:

(1) The usefulness and desirability of the product-its utility to the user and to the public as a whole.

(2) The safety aspects of a product-the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Dambacher*, 485 A.2d at 423 n. 5 (citing Dean John Wade, "On the Nature of Strict Tort Liability for Products," 44 Miss. L.J. 825, 837–38 (1973)). All of these factors are suggestions for the court to consider when making its analysis. *Riley*, 688 A.2d at 225.

The courts notes that the factor regarding "the availability of a substitute product which would meet the same need and *not be as unsafe*," *Dambacher*, 485 A.2d at 423 n. 5 (emphasis added), may differ slightly from the standard of a *safer* alternative. However, any such distinction does not change the court's analysis in this instance.

notes that the Pennsylvania Supreme Court has not expressly stated that showing a feasible alternative design is a required element for a products liability case. *But-see Duchess v. Langston Corp.,* 564 Pa. 529, 769 A.2d 1131, 1149 (2001) (quoting 63A. Am.Jur.2d *Products Liability* § 1095 (1997)) ("The reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is not only relevant in a design defect action, but is at the very heart of the case."). Nonetheless, several courts have found that proof of a feasible alternative design is indispensable under Pennsylvania law. *See, e.g., Fitzpatrick v. Madonna,* 424 Pa.Super. 473, 623 A.2d 322, 326 (1993); *Hollinger v. Wagner Mining Equip. Co.,* 667 F.2d 402, 409 (3d Cir.1981); *Short v. WCI Outdoor Products, Inc.,* No. 99–3526, 2000 WL 1659938, at *3 (E.D.Pa. Nov.2, 2000). The court finds these courts' analysis persuasive.

 While the existence of a feasible, safer alternative design is often stated as one of the factors to consider during the court's threshold determination of whether a product is unreasonably dangerous, *see Dambacher,* 485 A.2d at 423 n. 5, Plaintiff's ability to establish a design defect is inextricably tied to whether he can demonstrate that cigarettes could have feasibly been made safer. If one cannot demonstrate that a product is capable of a safer design, then logically it should be viewed as inherently dangerous. Under Pennsylvania law, a product is not defective merely because it is inherently dangerous. *See Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 898–99 (1975); *Hite v. R.J. Reynolds Tobacco Co.,* 396 Pa.Super. 82, 578 A.2d 417, 420 (1990).[5] Instead, Plaintiff must show a specific defect in the product. *See, e.g., Gunsalus,* 674 F.Supp. at 1159.

 Plaintiff alleges that he will do so by establishing a specific defect in the design of Philip Morris' cigarettes as to how they deliver smoke to a smoker.[6] Such an endeavor necessitates a showing of an alternative design which would significantly limit the danger of cigarette

---

**5.** A manufacturer is not the insurer against all injuries caused by its product, but it is the guarantor of its product's safety. *See, e.g., Azzarello,* 391 A.2d at 1024. The mere fact that a product causes an injury does not make it defective. *See, e.g., Berkebile,* 337 A.2d at 898. Further, a manufacturer is not liable for manufacturing or selling a legal but inherently dangerous product on any theory other than failure to warn. *See, e.g., Hite,* 578 A.2d at 420. The court also notes that "inherently dangerous" claims cannot survive solely on a "risk-utility" theory either. *See Hite,* 578 A.2d at 421–22; *Miller v. Brown & Williamson Tobacco Corp.,* 679 F.Supp. 485, (E.D.Pa. 1988); *Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1158–59 (E.D.Pa.1987);*see also Surace,* 111 F.3d at 1046 (stating that *Azzarello* "establishes no more than that the known hazards of products such as cigarettes .... do not automatically render their manufacturers, .. liable on the theory that their utility is outweighed by the risks of their usage").

**6.** Plaintiff has alleged that the cigarettes sold by Philip Morris were defectively designed "in that cigarettes, if used as designed by the Defendants, exposed consumers to tars, nicotine, carbon monoxide and other ingredients which are known to cause or contribute to the development of lung cancer and a host of other health risks ...." (Am.Compl.¶ 27(d).) Further, Plaintiff has alleged "the Defendants had (and have) available to them the technology and manufacturing ability to produce a substitute product (non-or less-addictive, carcinogenic and pathologic cigarettes) which would not pose as serious a health risk to consumers as cigarettes and/or the ability to eliminate or significantly reduce the unsafe characteristics of cigarettes without impairing its usefulness, to the extent that the product was in fact useful, or making it too expensive to maintain its utility." (Am.Compl.¶ 28.) Thus, in the court's view, Plaintiff has alleged a design defect in the Amended Complaint that Philip Morris' cigarettes delivered too many carcinogenic and other harmful substances as designed.

smoke. Otherwise, if Plaintiff is unable to show that the dangerous nature of a cigarette can be altered in a way so as to reduce the associated risks of smoking, then to allow a claim to go forward would be to allow an "inherently dangerous" claim simply recast as a "design defect" claim.[7]

This conclusion is supported by *Miller v. Brown & Williamson Tobacco Corp.*, 679 F.Supp. 485, (E.D.Pa.1988). In *Miller*, while granting summary judgment in favor of a cigarette manufacturer, the court stated the following:

> On this record, plaintiff will not be able to demonstrate that there is something wrong with the design of cigarettes or how the design could be improved. Plaintiff has not identified any witnesses who will, or can, testify to either point. Indeed, Count I, the only remaining count, of plaintiff's complaint alleged that cigarettes are "incapable of being made safe for their intended use" (emphasis added), an allegation that is entirely inconsistent with plaintiff's defective design claim.

679 F.Supp. at 488. Furthermore, the court noted:

> None of plaintiff's experts will testify as to how cigarettes can be made safer. Plaintiff's pretrial memorandum does not list a single witness or document or piece of evidence that will mention a safer cigarette.

*Id.* at 488–89 (footnote omitted).[8]

Therefore, Pennsylvania law dictates that Plaintiff's ability to show a feasible alternative design is an indispensable factor when determining whether the product is unreasonably dangerous.[9] Plaintiff contends he will establish, through documents and testimony, that a feasible alternative design did indeed exist which would have reduced the risks of Philip Morris' cigarettes. Philip Morris counters that Labelle's evidence proffered in opposition to summary judgment is inadmissible and insufficient.

 To support his claim, Plaintiff offers the deposition testimony of Dr. William Farone [10] which discusses an affidavit

---

7. This issue is applicable to both the strict liability and negligence theories. If a plaintiff cannot bring a claim under strict liability on the basis that a legal product is inherently dangerous, then logic dictates that, under a negligence based products liability claim, a plaintiff cannot merely show that a legal product is unavoidably unsafe because no amount of due care can make such products safer.

8. Additionally, the Pennsylvania Superior Court in *Hite*, while affirming the dismissal of the appellant's claim, noted that no contention was made "that a better design is available for the cigarette company's product. [Appellant] contends only that appellee's product is so inherently dangerous that the manufacturer should be made liable for the mischief it causes." 578 A.2d at 421. Presumably, had the appellant in *Hite* alleged a safer design for the cigarettes her case may have survived the motion for judgment on the pleadings.

9. Furthermore, the Pennsylvania Supreme Court has stated "[s]pecifically, in a design defect case, the question is whether the product should have been designed more safely," *Spino v. John S. Tilley Ladder Co.*, 548 Pa. 286, 696 A.2d 1169, 1172 (1997), which begs the question *could* the product have been designed more safely. *See also Azzarello*, 391 A.2d at 1027 ("The jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use."). Even if this conclusion is made in error and an alternative design is still merely one of many factors to consider, in the court's view the absence of such a design weighs heavily against a finding of an actionable defect.

10. Dr. Farone served as the director of Applied Research for Philip Morris from 1977 through 1984.

made in another case tried before this court, *Little v. Brown & Williamson et al.,* C.A. No. 2:98–1879–23, 1999 WL 33291385 (D.S.C.2001), that listed several technologies that Philip Morris could have employed to reduce the dangers of its cigarettes. (Farone Dep.7/20/2000 at 278–80.)[11] However, it is not enough to simply show that the product *could* have been designed in an alternative manner. *See Monahan v. Toro Co.,* 856 F.Supp. 955, 962 (E.D.Pa.1994) (noting that merely because an alternative exists does not mean "either that the chosen system is unsafe or that the alternative is safer."). Just as Plaintiff is required to show the defect caused Mrs. Labelle's injuries, *see, e.g., Sherk v. Daisy–Heddon,* 498 Pa. 594, 450 A.2d 615, 616 (1982), proving that a safer alternative design existed necessarily requires a showing that the alternative design would in fact reduce the risks of the product. In other words, Plaintiff must be able to show that the alternative design would have prevented or significantly reduced the risk of the injury allegedly caused by the product. *See Short v. WCI Outdoor Products, Inc.,* No. 99–3526, 2000 WL 1659938, at *6–*7 (E.D.Pa. Nov.2, 2000); *Riley v. Becton Dickinson Vascular Access, Inc.,* 913 F.Supp. 879 (E.D.Pa. 1995).

As to whether his alternatives would reduce the risk of injury, Dr. Farone provided the following testimony:

Q: Referring to your [*Little* ] affidavit, paragraphs 4 through 6, even if employed in the year 1960, would the use of all these methods together even have meant that people wouldn't get lung cancer if they smoked?

A: If you look at No. 8, it answers that question. If you make those changes *and then* you conduct animal testing of the biological effects of those specific brands which you could do from the . . . [1930's to the 1940's], you would have an indication of which one of these would-or all combined would have the lowest risk.

And I've defined in previous testimony the concept of a safe-you can never make it absolutely safe, but it becomes safe when you can no longer distinguish the cancer or disease rate between a smoker and a nonsmoker. . . . if you had applied the testing that was available at the time to these [technologies which

---

**11.** In this affidavit, Dr. Farone listed possible safer alternatives dealing with three areas: (1) tobacco growing; (2) tobacco processing; and (3) filter technologies. As for tobacco growing, Dr. Farone suggested that the tobacco industry could have: (1) used tobacco grown with nitrate-free fertilizers; (2) used tobacco grown with fertilizers screened for radioactive isotopes; (3) used air-cured Bright tobacco in place of flue-cured Burley tobacco; (4) used tobacco free of tobacco-specific nitrosamines; (5) used tobacco strains high in cellulose; (6) used tobacco strains in which the only alkaloid is nicotine; and (7) used strains of tobacco that do not concentrate or collect nitrates or heavy metals. (Farone Aff. in *Little v. Brown & Williamson et al.,* at ¶ 4.) He claimed that genetic modification of tobacco was widely available by the early 1970's. (*Id.* at ¶ 8.)

Dr. Farone also opined that tobacco industry could have done the following in regard to its tobacco processing: (1) extracted all alkaloids and removed tobacco-specific nitrosamines and nitrates coupled with the reintroduction of purified nicotine; (2) eliminated additives such as those containing nitrogen; (3) used more expanded tobacco; and (4) decreased use of reconstituted tobacco. (*Id.* at ¶ 5.) The technology to extract nitrates and nitrosamines was available from the mid–1950's. (*Id.* at ¶ 9.) Finally, Dr. Farone suggests the following filter technologies were available and would have provided a safer alternative: (1) use of charcoal filters; (2) use of additional, selective filters; (3) use of longer filters; (4) use of more efficient filters; and (5) use of ventilation at the tobacco end of filters. (*Id.* at ¶ 6.) He states that filter technology was highly developed by the late 1940's and early 1950's. (*Id.* at ¶ 9.)

allegedly would make cigarettes safer], there's an extremely high probability that you would come out with a product that would in fact meet that criteria.

Q: All right. So it's your testimony that if you incorporate all of these design suggestions in [the *Little* affidavit], apply some testing to it, that you'll make a cigarette that if people smoke it, they're no more likely to get cancer than if they didn't smoke?

A: That's-statistically, that would be correct, yes.

(Farone 7/20/00 Dep. at 281–282) (emphasis added). Dr. Farone's ultimate conclusion that a safer cigarette could have been developed is dependent on the conclusion that adequate testing of his suggested technologies would have yielded such a result. However, this ultimate conclusion reveals the fact that he has no knowledge of any testing of these alternatives and cannot quantify or establish the degree to which these technologies would in fact make Philip Morris' cigarettes safer.[12] Furthermore, Dr. Farone himself has not tested these alternatives to determine their relative safety. (Farone 4/27/00 Dep. 480, 482–83.)

These deficiencies in the proffered testimony of Dr. Farone are the same as those in *Little* which prompted this court to exclude his testimony on this issue because it did not meet the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, this court ruled that all of Dr. Farone's hypotheses had not been tested to the degree that *Daubert* required. (*Little,* January 19, 2001 Tr. 568). This court also noted that the plaintiff in *Little* was unable to present evidence that any of the alternative technologies would have resulted in a safer cigarette, were feasible, would have been used by the decedent, and would have prevented the decedent's cancer. (*Id.* at 568). These deficiencies in Dr. Farone's proffered testimony remain and therefore his testimony is inadmissible.[13]

■ Plaintiff attempts to bolster its alternative design evidence by submitting an affidavit from Dr. David M. Burns which states that had Dr. Farone's alternatives been implemented "it is probable that Mrs. Labelle would not have developed lung cancer (i.e. a crucial step in the cancer process would not have been completed) or she would not have developed lung cancer as early as she did." (Burns Aff. ¶ 12.)

---

**12.** Plaintiff impliedly recognizes this shortcoming by citing a vast number of documents and some testimony suggesting that Philip Morris chose not to test adequately in order to pursue a safer alternative design. However, Pennsylvania law has not explicitly recognized an independent tort for "negligent failure to test," *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 143–44 (3d Cir.2000), and these documents would only go towards establishing the lack of due care in Plaintiff's negligence claim. Accordingly, these documents have no relevance to the existence of a safer alternative design and therefore do not change the court's analysis of this issue.

**13.** Even if Dr. Farone's hypotheses were admissible, Plaintiff must still show that the alternatives were commercially feasible and

that the failure to incorporate the safer design was a proximate cause of the decedent's injury. In addition to failing to offer any admissible evidence that the alternatively designed cigarette would have reduced the risk of developing cancer, there is no indication that she would have used a safer alternative had one been available because the only evidence on the record regarding Mrs. Labelle's motivation behind choosing a cigarette was price. *See, White v. R.J. Reynolds Tobacco Co.,* 109 F.Supp.2d 424, 434 (D.Md.2000) (plaintiff did not establish that failure to incorporate alternative designs caused injuries where no evidence was offered that decedent "would have responded to hypothetical different products which were hypothetically available, and which were hypothetically safer") (applying Maryland law).

However, Dr. Burns' conclusions are based on Dr. Farone's inadmissible hypotheses and thus offer no support for Plaintiff's position. It should also be noted that this court in *Little* ruled that Dr. Burns is not qualified to testify about whether or not there is a safer alternative design or what it should be or what would happen if such a design were available. (*Little*, January 23, 2001 Tr. at 935.)

Accordingly, Dr. Farone's alternatives, as well as Dr. Burns' opinions based on those alternatives, are inadmissible and cannot support Plaintiff's burden of establishing a feasible, safer alternative. In this sense, as Plaintiff's counsel conceded to the court during a June 26, 2001 hearing, the court is faced with the same situation when it granted judgment as a matter of law in favor of Defendant Reynolds in *Little v. Brown & Williamson, et al. See (Little*, January 30, 2001 Tr. at 1737–47).

■ However, the court does note that Plaintiff in his response offers against Philip Morris evidence that Liggett did in fact develop a safer alternative design for cigarettes-the palladium catalyst cigarette[14]-which was allegedly ready for public marketing in the late 1970's.[15] As an initial matter, Plaintiff relies in part upon the deposition testimony of Dr. James Mold, Liggett's one time Assistant Director of Research, taken in November of 1988 in another case, *Cipollone v. Liggett Group, Inc.*, 683 F.Supp. 1487 (D.N.J. 1988), regarding the issue of the palladium catalyst cigarette. This testimony is inadmissible against Philip Morris as it never had an opportunity to fully cross examine Dr. Mold regarding information which arose after his deposition and was not available to Philip Morris, a party in the case, at that time.

Philip Morris also argues that any evidence of the palladium catalyst cigarette is inadmissible against it because it was the design of a competitor and "state of the art" evidence is inadmissible under Pennsylvania law with regard to strict liability design defect cases. *See Lewis v. Coffing Hoist Div., Duff–Norton Co.*, 515 Pa. 334, 528 A.2d 590 (1987); *Santiago v. Johnson Mach. & Press Corp.*, 834 F.2d 84 (3d Cir.1987); *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069 (3d Cir.1979). However, the "state of the art" or "industry standard" evidence excluded in these cases was offered by the defendants as part of their defense. These cases do not address whether "state of the art" evidence is inadmissible in a design defect claim based on a negligence theory. Nor do these cases dictate that the safety designs available at the time of manufacture have no relevance at all in a strict liability design defect claim. For Plaintiff's strict liability claim, he must show that a feasible, alternative design existed and if he can show that the palladium catalyst technology demonstrates that fact, then its existence could conceivably be admissible against Philip Morris. *Cf. Phatak v. United Chair Co.*, 756 A.2d 690, 693 (Pa.Super.Ct.2000). As for a negligence claim, the same evidence could be relevant to establish due care, or the lack thereof.

■ In addition to the Liggett documents referenced above, *supra* note 15, Plaintiff relies on an April 23, 2001 affidavit from Dr. Burns made after reviewing

---

**14.** Apparently, the development of such a cigarette was referred to variously as "Project XA" or the "palladium catalyst cigarette" and "Epic" was the proposed brand name.

**15.** Plaintiff offers various documents discussing the testing and development of the palladium catalyst project. *See, eg.,* (Pl.'s Response to Liggett Exs. 17, 18, 19, 29, 23, 28.) For purposes of the court's analysis, it is unnecessary to address these documents in detail.

the Liggett documents regarding palladium catalyst cigarettes which states:

> Given the complex nature of the cancer disease process, and accepting as true the opinions expressed by the authors of the foregoing documents that the above-described technologies, when implemented and tested significantly reduce the presence of carcinogens in tobacco smoke delivered by cigarettes, ... I conclude that these technologies, had they been implemented in the design of the cigarettes which Christine Labelle smoked, would have significantly reduced Ms. Labelle's risk of contracting lung cancer. In other words, had the design technologies suggested by the Liggett researchers been implemented and appropriate testing been conducted, it is probable that Ms. Labelle would not have developed lung cancer (i.e., a crucial step in the cancer process would not have been completed), or she would not have developed lung cancer as early as she did.

(Burns' Aff. ¶ 17.) Philip Morris argues that to allow Plaintiff to introduce new testimony long after discovery was closed [16] would violate federal and local rules. *See* Fed.R.Civ.P. 26 & 37(c); Local Rule 29.01. While this affidavit, in effect, expresses an opinion regarding the causation of the decedent's lung cancer, an area disclosed in Plaintiff's expert identification, the specifics of this opinion appear in this affidavit for the first time eight months after the close of discovery. Further, after reviewing the record, it appears that aside from the documents noted above and the deposition testimony taken in other cases, the palladium catalyst issue was not raised or explored throughout this litiga-

tion until this latest round of motions on the eve of trial. Given the importance of the issue to this case, it would be unfair to consider this opinion and allow Plaintiff to go forward on such a theory at this time. The court notes, in general, that the record is not fully developed in regard to the palladium catalyst cigarette as a safer alternative because it has been injected into this case at such a late stage in the litigation. Therefore it would be prejudicial to Philip Morris to allow Plaintiff to go forward based on his recent reliance on the palladium catalyst cigarette as Philip Morris has not had adequate time to address and explore this issue.

▮ Furthermore, the documentary evidence proffered by Plaintiff is not sufficient of itself to go to a jury because it would require the jury to decide questions of fact in areas in this case outside of general, lay experience such as cigarette design and the attendant causation issues. Even if the court were to consider Dr. Burn's opinion regarding this alternative design and its hypothetical effect on Mrs. Labelle's risk of developing cancer, Plaintiff still faces the problem of establishing causation as he has no evidence that Mrs. Labelle would have chosen to smoke this allegedly safer cigarette.

Whether the palladium catalyst technology if implemented would have created an entirely new and separate species of cigarette or merely have been incorporated into existing brands such as Marlboro is not clear. If the palladium catalyst cigarette is viewed as an entirely new species of cigarette, the Plaintiff's failure to show that the decedent would have used the alternative design is clearly significant.[17] There is no evidence from

---

16. Discovery was closed in this case in August of 2000.

17. Plaintiff complains that Pennsylvania law does not require proof that Mrs. Labelle would have used an alternatively-designed cigarette. While such proof is not explicitly required, logic dictates that such proof is necessary to establish causation. To hold otherwise would suggest that Philip Morris should manufacture only one type of cigarette-a pal-

which a jury could find that she would have chosen to use an alternative, safer cigarette. Throughout her smoking history low tar alternatives were available which she never chose to smoke. In fact, the only evidence on the record regarding Mrs. Labelle's motivation behind choosing a cigarette was price, (D. Labelle Dep. 6/14/99 at 60, 69–70), and the palladium catalyst cigarette apparently would have been more expensive.

If the palladium catalyst technology could have reasonably been incorporated into all brands of Philip Morris' cigarettes without any creating any new harm, an argument exists that the relevance of whether Mrs. Labelle would choose to smoke a safer cigarette is somewhat lessened. If the technology had been incorporated into all of Philip Morris' cigarettes, any choice she would have had would have been effectively eliminated as she would have gained the benefit of the allegedly safer cigarette by default. However, such is not the posture of this case as it is unclear from the record whether it was feasible to incorporate the technology in all brands of cigarettes as well as what the ramifications of doing so would be. Even if Plaintiff could show that Philip Morris could have feasibly incorporated the technology into just the particular brands Mrs. Labelle smoked, Plaintiff would then again have the difficulty of showing that she still would have chosen to smoke those brands.

Accordingly, summary judgment is granted in favor of Philip Morris as to all of Plaintiff's products liability claims.

## B. Pennsylvania Unfair Trade Practices and Consumer Protection Act

Philip Morris contends that Plaintiff's failure to establish that Mrs. Labelle witnessed or relied on any statement made by them is fatal to his claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201–1, et seq. (UTPCPL). Plaintiff asserts in response that Philip Morris is imposing a heightened evidentiary burden not found on the face of the statute by arguing that the statute requires reliance.

To determine what standard of proof is required for a violation of the UTPCPL, the court must analyze separately the implicated sections. As the Pennsylvania Superior Court stated in *DiLucido v. Terminix Int'l, Inc.*, 450 Pa.Super. 393, 676 A.2d 1237 (1996):

> If we explored the parallel actions for the deceptive conduct delineated in section 201–2(4), we would discover various standards for the distinct and separate deceptive practices. It would, therefore, seem logical to apply those same standards for actions under the corresponding subsections of 201–2(4) of the UTPCPL, so that persons would not be subject to differing standards for identical conduct.

ladium catalyst cigarette. However, the court does not view the law as requiring such measures. As the Pennsylvania Supreme Court stated in *Spino v. John S. Tilley Ladder Co.*, "the question is whether the product should have been designed more safely," 548 Pa. 286, 696 A.2d 1169, 1172 (1997), which suggests an "analysis of relativity," *Phatak*, 756 A.2d at 694. The court in *Phatak* also noted "[a] manufacturer could build automobiles to more closely resemble tanks. This might make them safer but, from a societal stand-point, it is unlikely doing so would be a valid tradeoff, particularly if, in the process, other danger is created." *Phatak*, 756 A.2d at 694. While the palladium catalyst cigarette is not as extreme as an example as manufacturing all cars so as to resemble tanks, the rationale is nonetheless applicable. Manufacturers are not required to produce only one kind of product-the most safe product. Instead, their products must not be unreasonably dangerous.

*Id.* at 1240. Plaintiff in his Amended Complaint alleges Philip Morris "engaged in conduct in direct contravention of the provisions of 73 P.S. § 201–2(4)(ii), (v), (vii), (ix), (xiv) and (xxi)." (Pl.'s Am. Compl. ¶ 58.) [18] The court will consider each of these sections in turn.

Section 201–1(4)(ii) defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." Under this section, "a plaintiff is required to establish that a defendant's representations were likely to cause confusion or misunderstanding." *DiLucido,* 676 A.2d at 1240. The *DiLucido* court concluded that § 201–2(4)(ii) does not require proof of the elements of common law fraud to establish a violation of the section. *Id.* at 1241. However, plaintiffs still have the "burden of establishing a causal connection

to or reliance on the alleged misrepresentations" of the defendant. *Id.* Plaintiff has failed to provide any evidence that Mrs. Labelle ever saw, read, heard, or was aware of any of the representations made by Philip Morris which he alleges "were likely to cause confusion or misunderstanding." Specifically, Plaintiff has testified as follows:

Q: Did you and Mrs. Labelle ever discuss the tobacco companies at any time prior to her death?

A: No, not really, ut-huh [sic].

Q: Did she ever indicate to you that she continued smoking because she placed any reliance on the fact that the tobacco companies were still selling cigarettes?

A: No, sir.

Q: Did she ever say anything to you at all that would make you think that she relied on the tobacco companies to advise her and other smokers of any prob-

---

18. The Amended Complaint lists the following wrongful conduct on the part of Philip Morris though not limiting such conduct to this list:

 a. Representing to the American public, and specifically to Christine LaBelle, that smoking cigarettes did not pose a risk to the health of the consumer, despite the fact that the Defendants knew or should have known otherwise;

 b. Representing to the American public, and specifically to Christine LaBelle, that cigarette smoke was not a cause of lung cancer and other diseases, despite the fact that the Defendants knew or should have known otherwise;

 c. Representing to the American public, and specifically to Christine LaBelle, that cigarette smoking was not addictive, despite the fact that the Defendants knew or should have known otherwise;

 d. Failing to warn the American public, and specifically Christine Labelle, of the health risks of smoking which were known by the Defendants;

 e. Representing to the American public, and specifically to Christine LaBelle, that the cigarette Defendants had a genuine interest in the health, welfare and safety of its customers, when in fact their only true interest was their own profits;

 f. Representing to the American public, and specifically to Christine LaBelle, that the Defendants were dedicated to conducting independent scientific experiments to discover the "truth" about smoking and health, when in fact the Defendants were engaged in the manipulation of scientific experiments and the destruction or concealment of scientific test results which were adverse to their own interests in selling cigarettes;

 g. Representing to the American public, and specifically to Christine LaBelle, that cigarette smoking was beneficial to smokers.

 h. Representing to the American public, and specifically to Christine LaBelle, that the Defendants had always and always would cooperate with those whose task it is to safeguard the public health, when in fact the Defendants viewed the protectors of public health as their enemies;

 i. Such other particulars as the evidence in this case will demonstrate.

(Pl.'s Am. Compl. ¶ 58.)

lems that people might develop if they smoked cigarettes?

A: She never discussed that with me.

Q: She never said anything to you that would make you think she was relying on the tobacco companies to give her more information about the dangers of smoking?

A: Not to my knowledge, no.

(Labelle Dep. 6/15/99 at 89–90.)

Q: Did she [Mrs. Labelle] ever say anything that suggested to you that in making this decision to keep smoking she was relying on anything that had ever been published or printed or said by either Philip Morris, Liggett, or any other tobacco company?

A: Not to my knowledge, no.

. . . .

Q: But you have no reason to believe she was ever mislead into believing that smoking was safe by anything any of the tobacco companies said; is that correct?

A: I don't have any idea about that. I can't make a comment on that.

Q: When you say you can't make a comment about it. I gather what you're saying is you don't have any information, based on your many discussions with Mrs. Labelle about quitting smoking, that she continued to smoke because she was somehow relying on something the tobacco companies said; is that correct?

A: Well, yeah. No, that's . . .

Q: That's correct?

A: Yes.

(*Id.* at 110–12.) Further, there is no evidence that Mrs. Labelle ever heard, saw or relied upon any Philip Morris advertisements when she began smoking:

Q: You mentioned there were cigarette advertisements on television. Did Christine [Labelle] ever talk about those advertisements?

A: No. I remember them, though.

Q: She didn't mention them?

A: No. I don't think so.

Q: Did she mention any cigarette advertisements from newspapers, magazines, anything like that?

A: No. No.

(Semanchick Dep. at 39.) Thus, any injuries sustained by Mrs. Labelle could certainly not be the result of any confusing representations made by Philip Morris if she was never aware of such representations. The court simply cannot assume that she was exposed to these representations allegedly causing confusion or misunderstanding.

 Under § 201–2(4)(v),[19] "a plaintiff must establish that a defendant's representation is false, that it actually deceives or has a tendency to deceive and that the representation is likely to make a difference in the purchasing decision." *DiLucido*, 676 A.2d at 1240–1241. Similarly to § 201–2(4)(ii), plaintiffs are not required to prove the elements of common law fraud to establish violations of § 201–2(4)(v), but plaintiffs still have the "burden of establishing a causal connection to or reliance on the alleged misrepresentations" of the defendant. *Id.* at 1241. Furthermore, § 201–2(4)(ix)[20] also requires a showing that the defendant's representation was false, that it actually deceived or had a tendency to deceive, and that it likely made a difference in the purchasing decision. *See Weinberg v. Sun Company,*

---

**19.** This section defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or

connection that he does not have." 73 P.S. § 201–2(4)(v).

**20.** This section prohibits "[a]dvertising goods or services with intent not to sell them as advertised." 73 P.S. § 201–2(4)(ix).

*Inc.*, 740 A.2d 1152, 1169–1170 (Pa.Super.Ct.1999). Thus § 201–2(4)(ix) also requires a causal connection to the alleged misrepresentations. Again; Plaintiff has failed to point to any evidence that Mrs. Labelle ever heard, saw or knew of any representations which would likely have made a difference in her purchasing decisions.

■■■■■■ Section 201–2(4)(vii) makes unlawful "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another ..." 73 P.S. § 201–2(4)(vii). This section is a fraud-based unlawful practice which consequentially requires the establishment of all the common law elements of fraud including reliance. *See Weinberg*, 740 A.2d at 1169. As discussed above, Plaintiff has failed to provide any evidence of reliance on the part of Mrs. Labelle.

■■■■ Plaintiff also asserts Philip Morris violated § 201–2(4)(xiv) which makes unlawful "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at prior to, or after a contract for the purchase of goods or services is made." 73 P.S. § 201–2(4)(xiv). This subdivision is inapplicable to the facts of this case as the Amended Complaint does not mention any written guarantee or warranty given by Philip Morris. No cause of action can be sustained under § 201–2(4)(xiv) in the absence of any written guarantee or warranty. *See Kaplan v. Cablevision of PA., Inc.*, 448 Pa.Super. 306, 671 A.2d 716, 721 (1996).

■■■■ Finally, Plaintiff alleges Philip Morris violated UTPCPL's "catch-all" provision, § 201–2(4)(xxi).[21] Clearly, before § 201–2(4)(xxi) was amended to include "deceptive" conduct in addition to "fraudulent" conduct, plaintiffs were required to prove the elements of common law fraud which includes reliance. *See Booze v. Allstate Insurance Co.*, 750 A.2d 877, 880 (Pa.Super.Ct.2000). However, the addition of "deceptive" conduct "signals approval of ... less restrictive interpretations" of UTPCPL by the legislature. *See Rodriguez v. Mellon Bank, N.A.*, 218 B.R. 764, 784 (E.D.Pa.1998). Accordingly, it is doubtful that proving the elements of common law fraud is still required. Nonetheless, even without having to prove reliance, Plaintiff's claim under § 201–2(4)(xxi) still fails for the reasons his claims under § 201–2(4)(ii), (v), and (ix) fail. He has offered no evidence establishing causation because he has not provided the court with any evidence that Mrs. Labelle was ever exposed to any "fraudulent or deceptive conduct" on the part of Philip Morris. As is true with all of his claims under UTPCPL, Plaintiff has alleged various acts of the Philip Morris which could reasonably be found as violations but he has not provided any evidence that Mrs. Labelle ever saw, heard, or was aware of any of these acts. Though one could speculate she was exposed to the alleged air of confusion surrounding the true risks involved with smoking, such speculation is insufficient to survive summary judgment.[22]

21. This section makes unlawful "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xxi). This section before it was amended in 1997 read "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." *See Booze v. Allstate Insurance Co.*, 750 A.2d 877, 880 (Pa.Super.Ct.2000).

22. The court notes Plaintiff's argument that as a remedial statute, the UTPCPL should be liberally construed to effect its purposes. *See Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812, 816 (1974) ("Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices"). However, Pennsylvania courts

Accordingly, summary judgment is granted in favor of Philip Morris as to all of Plaintiff's UTPCPL claims.

## C. Negligent Misrepresentation

While Plaintiff has withdrawn his fraud claims, his negligence claims based on alleged misrepresentations may still remain. The court noted in its prior Order, "to the extent these claims depend on allegations that defendants intentionally misrepresented the health effects of smoking, it is more appropriately analyzed as a claim for fraud." (March 18, 1999 Order at 16 n. 8.) Accordingly, any claims based on alleged *intentional misrepresentations are no longer before the court in light of Plaintiff's withdrawal of all of his fraud claims.* However, the court also noted that "to the extent plaintiff is alleging negligent misrepresentations on the part of defendants, those allegations may be characterized as part of plaintiff's negligence claim." (*Id.*)

■ Summary judgment is proper to the extent that any negligent misrepresentation claim is being asserted because, as noted above, Plaintiff has failed to put forth any evidence that Mrs. Labelle relied upon any statements made by Philip Morris. To bring a negligent misrepresentation claim "requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) *which results in injury to a party acting in justifiable reliance on the misrepresentation.*" *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 561 (1999) (emphasis added). Plaintiff has not contested Philip Morris' assertions that he has no evidence showing Mrs. Labelle relied on any statement made by them, nor has he provided the court with any such evidence to rebut

such a conclusion. Accordingly, summary judgment is granted as to any negligent misrepresentation claim asserted by Plaintiff against Philip Morris.

## D. Conspiracy

■ Philip Morris contends that Plaintiff's civil conspiracy claims must fail because he has failed to offer any evidence of malice. Plaintiff responds by arguing that Philip Morris urges an overly narrow definition of malice under Pennsylvania law, and Plaintiff's showing of reckless behavior without regard to social duty satisfies his burden.

■ Under Pennsylvania law, to prevail on a civil conspiracy claim a plaintiff must prove that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Skipworth v. Lead Indus. Ass'n,* 547 Pa. 224, 690 A.2d 169, 174 (1997). Proof of malice, i.e. an intent to injure, is also essential to the proof of conspiracy. *Id.* at 174. Plaintiff's attempt to invoke the holding in *Cooper v. Delaware Valley Medical Center,* 539 Pa. 620, 654 A.2d 547 (1995), where the court noted that malice "does not necessarily mean a particular ill will toward another; it comprehends in certain cases recklessness of consequences and a mind regardless of social duty," *id.* at 554, is unavailing. *Cooper* dealt with defining the term 'malice' as used in a statute, the Pennsylvania Peer Review Protection Act, and is completely inapplicable to the context of civil conspiracy. Adopting Plaintiff's definition of malice would fly in the face of the numerous Pennsylvania cases defining the term in the context of civil conspiracy as meaning an intent to injure. *See, e.g., Skipworth,* 690 A.2d at 174; *Strickland v.*

---

have clearly required reliance for the fraud-based claims and at least causation as to any other claims under the UTPCPL, and even the

most liberal construction of the UTPCPL cannot overcome these requirements.

*University of Scranton,* 700 A.2d 979, 988 (Pa.Super.Ct.1997); *Corrigan v. Methodist Hosp.,* 853 F.Supp. 832, 837 (E.D.Pa.1994) (applying Pennsylvania law). Plaintiff has failed to show any intent to injure Mrs. Labelle on the part of Philip Morris, and therefore summary judgment is proper as to Plaintiff's civil conspiracy claim. *See Corrigan,* 853 F.Supp. at 837 (holding that requisite malice cannot be inferred from the mere fact that defendants stood to gain financially from their allegedly harmful and illegal actions).

### IV. CONCLUSION

It is, therefore.

**ORDERED,** for the foregoing reasons that Defendant Philip Morris' Motion for Summary Judgment is **GRANTED** as to all of Plaintiff's claims.

**AND IT IS SO ORDERED.**