J-A29004-17

2018 PA Super 33

| TERENCE D. TINCHER AND JUDITH R. TINCHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OMEGA FLEX, INC. | : | |
| | : | No. 1285 EDA 2016 |
| Appellant | : | |

Appeal from the Judgment Entered May 3, 2016
In the Court of Common Pleas of Chester County Civil Division at No(s):
June Term, 2008 No. 08-00974

BEFORE:   LAZARUS, J., PLATT*, J., and STRASSBURGER*, J.

OPINION BY LAZARUS, J.:                    **FILED FEBRUARY 16, 2018**

Omega Flex, Inc., appeals from the judgment entered in favor of Terence D. and Judith R. Tincher following a jury trial and the denial of its post-trial motions. Omega Flex contends that it is entitled to a new trial because the Pennsylvania Supreme Court has determined that the trial court's jury instruction contained a fundamental misstatement of the governing law. We agree and vacate the judgment, reverse the order denying post-trial relief, and remand for a new trial.

We draw our summary of the facts and much of the procedural history of the case from the Supreme Court's decision, ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328, 335–36 (Pa. 2014). The Tinchers lived in the central unit of a two-story triplex in Downingtown, Chester County, which they purchased in 2005. Early in the morning of June 20, 2007, a fire erupted in their home.

_____
\* Retired Senior Judge assigned to the Superior Court.

Investigators later determined that a nearby lightning strike caused a small puncture in corrugated stainless steel tubing ("CSST") that transported natural gas to a fireplace located on the first floor of the residence. Heat attending the melting of the CSST caused by the lightning strike ignited the natural gas and fueled a fire estimated to have burned for over an hour before it was discovered. No one was injured in the fire, but the fire caused significant damage to the Tinchers' home and belongings.

The CSST installed in the Tinchers' home was manufactured and sold by Omega Flex as part of a gas transportation system marketed as the "TracPipe System." In January 2008, the Tinchers sued Omega Flex, asserting claims premised on theories of strict liability, negligence, and breach of warranty.[1] The strict liability claim was based on section 402A of the American Law Institute's Restatement (Second) of Torts (1965), as adopted, followed, and construed in Pennsylvania. Section 402A of the Restatement (Second) of Torts provides:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

---

[1] The Tinchers also made a fire claim to their home insurer, United Services Automobile Association ("USAA"). USAA compensated the Tinchers for their loss up to the limit of their policy and received an assignment of liability claims. USAA prosecuted the claims against Omega Flex in the name of the Tinchers to obtain reimbursement of the insurance proceeds payout, but the Tinchers retained an interest in the litigation to recover the amount of their losses that exceeded their insurance coverage.

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1).[2]  The Tinchers alleged that "the CSST incorporated into the TracPipe System is defective, and unreasonably dangerous to intended users, because its walls are too thin to withstand the effects of lightning."  **Tincher**, 104 A.3d at 336.

Prior to trial, Omega Flex moved to have the trial court apply Sections 1 and 2 of the Third Restatement of Torts: Products Liability (1998) and to deliver jury instructions based on the Third Restatement, rather than the Restatement (Second) of Torts.[3]  The Tinchers responded that the Second

---

[2] Section 402A(2) provides:

The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

[3] Sections 1 and 2 of the Third Restatement provide:

**§ 1 Liability of Commercial Seller or Distributor for Harm Caused by Defective Products**

One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

Restatement remained the law of Pennsylvania and the court, therefore, should base its jury instructions on the Second Restatement and the Supreme Court's decisions under that Restatement, including ***Azzarello v. Black Bros. Co.***, 391 A.2d 1020 (Pa. 1978). In ***Azzarello***, the Court had held that: it was improper to introduce negligence concepts into a strict liability case; it was for the court, not a jury, to determine whether a product was "unreasonably dangerous" under the Second Restatement; the dispositive

---

**§ 2 Categories of Product Defect**

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:

(a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

Restatement (Third) of Torts: Products Liability §§ 1-2.

question in a case alleging that there was a defective design was whether the product is safe for its intended use; and in such a case, "the seller is the 'guarantor' of the product, and a jury could find a defect 'where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use.'" *Tincher*, 104 A.3d at 367, quoting *Azzarello*, 391 A.2d at 1025-27. The trial court did not immediately rule on Omega Flex's motion.

During their case in chief, the Tinchers introduced evidence that, on the night of the fire, lightning transferred an electrical charge to the TracPipe System and that heat from the lightning punctured the CSST and ignited the natural gas. Their experts testified that the CSST was susceptible to perforation because it is very thin (1/100 of an inch in thickness) and it withstands the transfer of much less electrical energy than would an alternative material, such as cast iron pipe.

After the Tinchers rested, Omega Flex moved for a nonsuit under the Restatement (Second) and *Azzarello*, assuming the court had denied its request to apply the Restatement (Third). The trial court denied the nonsuit, and Omega Flex then introduced its own evidence that the TracPipe System was not defective or unreasonably dangerous. Among other things, Omega Flex offered evidence of the utility of CSST as compared to cast iron pipe, noting such things as its resistance to corrosion and ruptures, ease of

installation and relocation, and decreased susceptibility to gas leaks because it required fewer joints. *Tincher*, 104 A.3d at 337-38.

After resting its case, Omega Flex sought a directed verdict, contending that TracPipe was not unreasonably dangerous under the Second Restatement and *Azzarello*. The trial court denied Omega Flex's motion and then instructed the jury on the Tinchers' strict liability claim, as follows:

> The contention of the [Tinchers] in this case is that there is a defect in this product, this TracPipe. To state a products liability claim, essentially it's strict liability, a plaintiff must prove, first, that the product was defective. Second, that if [*sic*] a defect existed when it left the hands of the defendant, that is, left the process by which it was produced at the defendant['s] plant. And three, that the defect caused the harm.
>
> A product is defective when it is not safe for its intended purpose. That is, it leaves the suppliers' control lacking any element necessary to make it safe for its intended use. The inquiry is whether or not there is a defect, not whether the defendant['s] conduct was negligent. In strict liability there is no consideration of negligence. It is simply, was the product defective or wasn't it defective.
>
>                 \*     \*     \*
>
> Defective design. The manufactur[er] of a product is really a guarantor of its safety. When we talk about strict liability, the product must be provided with every element necessary to make it safe for its intended use [a]. And without any conditions that make [] it unsafe for its intended use. If you find that the product in this case, the TracPipe, at the time it left the defendant[']s control, lacked any elements necessary to make it safe for its intended use, or contained any condition that made it unsafe for its intended use, and there was an alternative more practical design, more safer [*sic*] design, then the product is considered defective and the defendant is liable for the harm, if you find that defect caused the harm[, and] was the proximate cause of the harm to the plaintiffs.

- 6 -

Now, ladies and gentlemen, a product is not defective merely because it is possible to be injured while using the product. The imposition of strict liability is not meant to transform manufacturers into insurers of all injuries that are potentially possible and [*sic*] at the hands of a product. A manufacturer of a product may be a guarantor of the product[']s safety, but under no circumstances is the manufacturer an insurer of the safety of the product. The law does not force the manufacturer to become the insurer of the product under all conditions and uses. A manufacturer is not required to make an already safe product safer, or to utilize the safest of all designs. The manufacturer is not required to produce or design a product incorporating only features representing the ultimate in safety design. To prevail on a design defect theory, plaintiffs must prove that the product is defective and that at the time it left the control of the manufacturer it lacked the feature necessary to make it safe for its intended use, or contained a feature that made it unsafe for its intended use.

In other words, you may not find that the TracPipe product is defective merely because it could have been made safer. Instead, you may only render a verdict for the plaintiff if you conclude and are convinced that the TracPipe is in fact defective and was so when it left the hands of the manufacturer and that defect was the proximate cause of the [Tinchers'] loss.

As I said before, and I instruct you that in order to establish strict liability for putting a defective product in the stream of commerce, the plaintiffs are not required to prove that the defendant was negligent. Negligence and strict liability are two separate concepts. I'll get to negligence in a second. And no consideration should be given to negligence when considering strict liability for a defective product. It's two different concepts. I understand it's not the easiest thing to keep in mind. I'm trying to point out there is a difference between strict liability for putting a defective product that was defective when it was designed and made in this stream of commerce that causes harm to someone else, an intend[ed] user, not just any user, but an intended user of that product.

Obviously, ladies and gentlemen, if this product was manufactured and, obviously, the—with all of the testimony in this case and the steps that were taken during the design and manufacturing process, Omega Flex knew it was going to be used

- 7 -

for its intended purposes, to carry gas[,] natural gas, the manufacturer supplying the pipe guaranteed it would be safe for its intended use. That is what strict liability means. So if something that is intended to be safe for the use intend[ed] to be made of it is not, and it's proven that it's not, and that proof has to come from the plaintiff, and that defect is the proximate cause of what happens, there is a lot of testimony in this case about that, then that is what strict liability means. It does not have anything to do with negligence in that aspect of the case. That is why the risk of loss, or if there is, or if you find there is a defect in strict liability, the risk of loss is placed upon the supplier or manufacturer that put that product in this stream of commerce. The risk of loss for injuries resulting from the defective product is best warned [*sic*] by the person who manufactured it, principally because they are the ones that put it in the stream of commerce and said it would work for its intended purpose.

*Tincher*, 104 A.3d at 339-40.

During its deliberations, the jury, conscious of the charge, twice (on separate days) asked the court to define "defective." In response, the court re-read the relevant portions of its charge on that issue.[4] The jury also had

_____

[4] In response to the first request, the court stated:

I can tell you the definition of defect.

The manufacturer of a product is a guarantor of its safety in the strict liability sense, all right, the product must be provided with every element necessary to make it safe for its intended use. And without any condition that makes it unsafe for its intended use.

If you find that the product at the time it left the defendants' control lacked any element necessary to make it safe for its intended use, or contained any condition that made it unsafe for its intend use, then the product was defective and the defendant is liable for harm caused by the defect.

the court re-read the definition of "negligence" three times and of "proximate cause" twice. The jury asked whether it had been directed to "take the role of lightning . . . out of consideration from either charge," to which the court responded, "no." When a juror followed up by asking, "then lightning is to be considered?," the court responded, "Yes." N.T., 10/19/10, at 819-24.

The jury returned a verdict in favor of the Tinchers on the products liability claim and in favor of Omega Flex on the negligence claim. The jury

_____

N.T., 10/19/10, at 822. Its response to the second request was similar:

> [Y]ou've requested me to define the word defective. Actually the instruction relates to defect and we talk about design defect here. Here it is.
>
> The manufacturer of a product in terms, I will say this, in terms of the strict liability portion of the claim, and whether there is a negligence claim and in a separate strict liability claim, this relates to the strict liability defect.
>
> The manufacturer of a product is a guarantor of its safety. The product must be provided with every element necessary to make it safe for its intended use, and without any condition that makes it unsafe for its intended use. If you find that the product, at the time it left the defendants' control, lacked any element necessary to make it safe for its intended use, or contained any condition that made it unsafe for its intended use, then the product was defective and the defendant is liable for all harm caused by the defect.
>
> That is the definition of defect, design defect. Please remember, however, that I gave you other instructions relating to strict liability and I think asking for piece meal portions -- I just want to remind you there are other things that play in the definitions and in the instructions.

N.T., 10/20/10, at 825-26.

awarded the Tinchers more than $950,000 in damages. After adding delay damages, the court entered judgment for almost $1.03 million. Omega Flex filed post-trial motions, which the trial court denied.

Omega Flex appealed the trial court's judgment to this Court, which affirmed. *Tincher v. Omega Flex, Inc.*, No. 1472 EDA 2011 (Pa. Super., Sept. 25, 2012) (unpublished memorandum). Omega Flex petitioned for allowance of appeal to the Supreme Court, which granted review on the question of "[w]hether this Court should replace the strict liability analysis of Section 402A of the Second Restatement with the analysis of the Third Restatement." *Tincher*, 104 A.3d at 343.

In an opinion dated November 19, 2014, the Supreme Court declined to adopt the Third Restatement, overruled *Azzarello*, and crafted a new test for proving whether a product is in a defective condition under Section 402A of the Second Restatement of Torts:

> The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions.

*Id.* at 335. The Court added:

> Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, *e.g.*, on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

- 10 -

*Id.*

The Court devoted considerable attention to the changes to Pennsylvania law that would result from its formulation of a "Post-*Azzarello* Strict Liability Construct." *See Tincher*, 104 A.3d at 394. First, however, the Court reviewed the elements of *Azzarello* that needed to be jettisoned because they "fail to reflect the realities of strict liability practice and to serve the interests of justice." *Id.* at 375-76.[5] The Court explained that *Azzarello*'s insistence on purging "negligence-related rhetoric" from strict liability cases was applied in an overly broad manner that ultimately "perpetuated jury confusion." *Id.* at 377, 381. To achieve its goal, *Azzarello* prohibited a jury from considering whether a product is defective because it is unreasonably dangerous or not duly safe, reserving that critical issue to the trial court itself, even though "trial courts simply do not necessarily have the expertise" to decide such issues. *Id.* at 377, 380. For the jury charge, it created a requirement that a product have "every element necessary to make it safe for use," a standard that was "impracticable" in application. *Id.* at 379. *Azzarello* coupled that new standard with a confusing statement that a product supplier "is not an insurer of a product, although it is a guarantor" — terms of art that were given "no further explanation of their practical import."

---

[5] Notably, in the Supreme Court, the Tinchers agreed with Omega Flex "that *Azzarello* was wrongly decided." *Tincher,* 104 A.3d at 344.

***Id.*** The Court in ***Tincher*** overruled ***Azzarello*** to the extent these various pronouncements were in tension with the new principles it articulated. ***Id.*** at 376.

Looking forward, the Court constructed its new two-part defect test. ***Id.*** at 384-94, 399-406. It then restored the question of a product's defectiveness, including any balancing of risks and utilities, *to the jury*, ***id.*** at 406, and returned the trial court to its "ordinary gate-keeper role" ("monitoring litigation, mediating or adjudicating any subsidiary differences, and pending objections and motions"), ***id.*** at 407. The Court then pronounced the following regarding jury instructions:

> One crucial aspect of the trial court's role is, of course, the task of defining the strict liability legal universe within which a particular jury operates for purposes of discharging its function. To reiterate, a jury charge is adequate "unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error."
>
> In this case, in critical part, the trial court instructed the jury in accordance with the law as articulated in ***Azzarello*** and its progeny. ***See*** N.T., 10/19/10, at 794-98. We have now overruled ***Azzarello*** and we have additionally explained foundational issues related to the strict liability cause of action in Pennsylvania . . . Going forward, consistent with this decision, when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product. The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and whether a party has met the burden to prove the elements of the strict liability cause of action are issues for the finder of fact, whether that finder of fact is judge or jury. A question of whether the party has met its burden of proof is properly "removed" — for example, via adjudication of a dispositive motion — "from the jury's consideration only where it is clear that reasonable minds [cannot]

differ on the issue." Thus, the strict liability construct we articulate today comfortably accommodates the gate-keeping role ordinarily relegated to the trial court in tort actions.

[] In charging the jury, the trial court's objective is "to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." . . . "[T]he trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration."

[] The crucial role of the trial court is to prepare a jury charge that explicates the meaning of "defective condition" within the boundaries of the law, *i.e.*, the alternative test standard, and the facts that pertain.

*Id.* at 427-28 (citations omitted).

With respect to the effect of its decision on this case, the Court stated:

[I]n light of the decision to overrule **Azzarello**, questions remain regarding whether Omega Flex should benefit from the application of our Opinion upon remand and, moreover, whether Omega Flex is entitled to a new trial. Here, Omega Flex preserved and presented its claim that **Azzarello** should be overruled to the trial court and on appeal; as a result, we hold that Omega Flex is entitled to the benefit of our decision in this regard. Whether Omega Flex is entitled to additional relief, including a new trial or judgment notwithstanding the verdict is not apparent upon the record before us. **See Price** [**v. Guy**, 735 A.2d 668, 672 (Pa. 1999)] (new trial appropriate if erroneous jury instruction amounts to fundamental error or the record is insufficient to determine whether error affected verdict); **Degenhardt** [**v. Dillon Co.** 669 A.2d 946, 950 (Pa. 1996)] (judgment notwithstanding verdict is appropriate only if no two reasonable minds could disagree that verdict should be in favor of movant).

**Tincher**, 104 A.3d at 432-33. Thus, the Supreme Court remanded this case to the trial court for "further action upon post-trial motions" and permitted the trial court to order the filing of supplemental post-verdict motions or briefs on the issue. **Id.**

- 13 -

On remand to the trial court, Omega Flex filed a renewed motion for post-trial relief in which it abandoned its request for entry of judgment notwithstanding the verdict and sought only a new trial. The parties submitted additional briefs, and the trial court held oral argument. On March 22, 2016, the trial court denied Omega Flex's motion, and it entered judgment against Omega Flex on May 3, 2016.

In denying Omega Flex's motion, the trial court recognized that "[t]he predominant factual issue in the case was whether the corrugated stainless steel tubing was defective because of its inferior thickness (equal to the thickness of four sheets of paper), rendering it incapable of withstanding perforation by an electrical arc produced by lightning." Trial Court Opinion, 3/22/16, at 2-3. The court gave the following explanation of why it was denying a new trial:

> [T]he trial judge is no longer the "gatekeeper," whose function it previously was to initially consider the risk associated with the product weighed against its utility before sending the case to the jury on the plaintiff's strict liability claim. The question whether a product is in a defective condition is removed "from the jury's consideration only where it is clear that reasonable minds cannot differ on the issue." Instantly, the case was submitted to the jury to decide whether TracPipe is defective. The **Tincher** Court plainly held that Omega Flex "is entitled to the benefit of our decision" overruling **Azzarello**.
>
> Omega Flex consequently argues that it is entitled to a new trial because the jury, as the finder of fact, now must be permitted to balance the evidence and determine whether the risk of using TracPipe is outweighed by its utility, and whether the product is unreasonably dangerous. It also argues that, had the parties known they would be trying the case on the basis of the risk of TracPipe versus its utility, Omega Flex would have presented a

- 14 -

different evidentiary case. That simply is not supported by the trial record. In fact, the case was tried by the parties on competing evidence implicating the relative merits of the use of TracPipe versus black iron pipe in home construction, all with an eye toward convincing the jury whether the risks associated with the use of TracPipe greatly outweighed, or not, the use of black iron pipe. Both parties, through their witnesses, and through cross-examination, hammered those points home to the jury throughout the trial. In opposition to [Omega Flex's] renewed motion for post-trial relief, [the Tinchers'] brief details the evidence in this regard proffered to the jury by both parties, and that evidence need not be repeated here by this court.

With that evidence before the trial court, we denied [Omega Flex's] motion for a directed verdict, and submitted the case to the jury with the instruction to decide whether TracPipe was defective, that is, contained any condition that made it unsafe for its intended purpose. Speaking plainly, a product used to convey natural gas in a residential dwelling that is determined by the jury to be defective for the obvious reason that its component parts are inadequate to preclude the unanticipated escape of gas must also be considered unreasonably dangerous. This is the conclusion the jury reached in this case, and in this court's view, reasonable minds could not differ on the point. With the jury fully cognizant of the evidence [ad]duced by the parties over 7 days of trial premised upon the risk versus the utility of the two means of conveying natural gas in a home, to conclude now that the jury would have reached a different result had it been directed, as the finder of fact, to conclude that TracPipe's utility outweighed its risks, in the context of the facts of this case, would require one to ignore the voluminous evidence the jury heard on those very issues.

. . . [Our Supreme Court] noted that a new trial is appropriate if an erroneous jury instruction amounts to fundamental error *or* the record is insufficient to determine whether such error affected the verdict. It is this court's opinion that based on the evidence the jury heard, the instruction we gave was not prejudicial to Omega Flex for the reasons noted above, and did not affect the jury's verdict. Indeed, in the instant case, it was proven by a preponderance of the evidence that TracPipe's danger was unknowable and certainly unacceptable to the Tinchers, the very standard required by the **Tincher** Court.

- 15 -

***Id.*** at 5-8 (citations omitted).  The court added that "[i]f the jury instruction we gave in this case required a new trial . . . , it is evident that our Supreme Court would have simply remanded this case for a new trial."  ***Id.*** at 7.[6]

Omega Flex filed this appeal on April 22, 2016.[7]  In it, Omega Flex raises the following issue:  "Whether the trial court erred by denying Defendant Omega Flex's motion for a new trial."  Brief of Appellant, at 7.  We

_____

[6] Curiously, the court closed its opinion with a statement of why Omega Flex was not entitled to judgment notwithstanding the verdict, even though Omega Flex no longer sought that relief.  The court stated:

> Judgment notwithstanding the verdict may be entered only if movant is entitled to judgment as a matter of law and if evidence presented at trial was such that no two reasonable minds could disagree that the verdict would be in favor of movant.  In determining whether judgment notwithstanding the verdict is required, only evidence which supports the verdict may be considered, giving verdict winner the benefit of any doubt.  Giving the [Tinchers] the benefit of any doubt, we conclude that reasonable minds would agree that [Omega Flex] is not entitled to judgment on the facts educed in this case.

Trial Court Opinion, 3/22/16, at 8-9 (citation omitted).

[7] Omega Flex's notice of appeal was filed from the March 22, 2016, order denying post-trial motions, which was an unappealable order.  ***See Becker v. M.S. Reilly, Inc.***, 123 A.3d 776, 777 n.1 (Pa. Super. 2015) ("Orders denying post-trial motions are interlocutory and not ordinarily appealable"); ***U.S. Bank, N.A. v. Pautenis***, 118 A.3d 386, 388 n.2 (Pa. Super. 2015) ("an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions" (brackets omitted)).  However, the trial court's entry of judgment on May 3, 2016, perfected the appeal.  ***See*** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").  Therefore, on July 11, 2016, we denied a motion by the Tinchers to quash the appeal.  We similarly reject a suggestion in the trial court's Pa.R.A.P. 1925(a) opinion that we quash the appeal.

hold that the trial court erred and that Omega Flex is entitled to a new trial as a result of the Supreme Court's decision.

In **Harman ex rel. Harman v. Borah**, 756 A.2d 1116 (Pa. 2000), our Supreme Court set forth the two-stage standard of review applicable to an order addressing a request for a new trial:

> Trial courts have broad discretion to grant or deny a new trial. The grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings.
>
> *    *    *
>
> There is a two-step process that a trial court must follow when responding to a request for new trial. First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. . . .
>
> To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. . . . First, the appellate court must examine the decision of the trial court that a mistake occurred. . . . If the mistake concerned an error of law, the court will scrutinize for legal error[.]
>
> *    *    *
>
> If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis. The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

*Id.* at 1121-23 (quotation marks and citations omitted; some formatting altered).

With respect to the first part of this analysis, there is no question that the trial court's jury charge was incorrect. As the Supreme Court noted, "in critical part, the trial court instructed the jury in accordance with the law as articulated in *Azzarello* and its progeny." *Tincher*, 104 A.3d at 407; *see also* Trial Court Opinion, 3/22/16, at 3 ("we charged as required by *Azzarello*"). The charge thus contained all of the product liability law under *Azzarello* that the Supreme Court has now disapproved, including a definition equating a defective product with one that "leaves the suppliers' control lacking any element necessary to make it safe for its intended use," and a declaration that a manufacturer "is really a guarantor of [a product's] safety" but not "an insurer of [that] safety." *Tincher*, 104 A.3d at 339 (quoting charge). The Supreme Court has now overruled *Azzarello* and determined that this statement of product liability law was incorrect. The trial court's jury charge, therefore, was erroneous. Thus, the controlling question here is whether the trial court abused its discretion when it declined to order a new trial despite that error.

Omega Flex argues that because the jury was instructed only on whether TracPipe was defective under *Azzarello*'s now-overruled design defect test, and not on the new definition of "defect" under *Tincher*, a new trial is required. Brief of Appellant, at 26-28. Omega Flex argues that an

- 18 -

*Azzarello* instruction on whether TracPipe lacked any element necessary to make it safe for its intended use is distinct from whether TracPipe was unreasonably dangerous under *Tincher*'s new, decidedly different formulation of what makes a product defective — that it poses a danger that is unknowable and unacceptable to the average or ordinary consumer, or that a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. *Id.* at 26. That the court did not instruct the jury under the *Tincher* standard was an error so prejudicial, Omega Flex asserts, that a new trial is necessary. *Id.* at 28.

The Tinchers counter that our Supreme Court could have remanded the case for a new trial, but instead opted to have the trial court evaluate whether a new trial was justified. Brief of Appellees, at 9. In the Tinchers' view, notwithstanding the overruled jury instruction, a new trial would not have resulted in a different verdict under the new test for design defects. *Id.* The Tinchers agree with the trial court that, under either standard propounded by the new test, no prejudice inured to Omega Flex. *Id.* at 10. The Tinchers approvingly quote the trial court's reasoning: "to conclude now that the jury would have reached a different result had it been directed [under the risk-utility standard], in the context of the facts of this case would require one to ignore the voluminous evidence the jury heard on those very issues." *Id.* at 11, quoting Trial Court Opinion, 3/22/16, at 7.

The Supreme Court has instructed:

Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Error will be found where the jury was probably [misled] by what the trial judge charged or where there was an omission in the charge. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error. In reviewing a trial court's charge to the jury[,] we must look to the charge in its entirety.

*Passarello v. Grumbine*, 87 A.3d 285, 296-97 (Pa. 2014), quoting *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1069-70 (Pa. 2006); *see Tincher*, 104 A.3d at 351. Here, the trial court gave a charge on a determinative issue that failed to conform to the applicable law, as stated in *Tincher*. We conclude, therefore, that the charge amounted to fundamental error. The Supreme Court in *Tincher* made clear that Omega Flex would be entitled to a new trial if the charge amounted to fundamental error. *See Tincher*, 104 A.3d at 410, citing *Price v. Guy*, 735 A.2d 668, 672 (Pa. 1998) (new trial appropriate if erroneous jury instruction amounts to fundamental error).

The objective of a jury charge "is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Tincher*, 104 A.3d at 351. The charge "defines the legal universe in which a jury operates for the purposes of the verdict." *Id.* at 347 n.5. As the trial court observed, the "predominant factual issue" in this case was whether the steel tubing in the TracPipe system was defective. Trial Court Opinion,

- 20 -

3/22/16, at 2. The charge instructing the jury on how to determine whether the product was defective therefore was critical to this case.[8] As noted, all parties agree that this charge was wrong in that, among other things, it employed an incorrect definition of a product "defect" in light of the Supreme Court's decision in *Tincher*.

We have held that a charge containing an incorrect definition of a term critical to a disputed factual issue is fundamentally erroneous and entitles the affected party to a new trial because "[j]ury instructions must contain correct definitions of legal terms." *Gorman v. Costello*, 929 A.2d 1208, 1213 (Pa. Super. 2007). Thus, for example, we ordered a new trial in *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998), where the trial court gave a dictionary definition of the word "substantial" in connection with its instruction on the "substantial factor" test for proving causation in a tort case. Use of the dictionary definition was "impermissible [because] the word

---

[8] For this reason, our decision in *Amato v. Bell & Gossett*, 116 A.3d 607 (Pa. Super. 2015), *appeal dismissed as improvidently granted sub nom. Vinciguerra v. Bayer CropScience Inc.*, 150 A.3d 956 (Pa. 2016), which affirmed the trial court's decision not to order a new trial in a product liability case following the *Tincher* decision, is distinguishable. *Id.* at 621-23. The appellant in *Amato* complained that the trial court failed to instruct the jury on whether its product was unreasonably dangerous under *Tincher* due to a lack of warnings and in light of the state of the art at the time. We held, however, that the omitted charge was not required because the appellant defended the case on the theory that its product "was not dangerous *at all*," making a charge on warnings and state of the art unnecessary under its theory of the case. *Id.* at 622-23 (emphasis in original). Here, the challenged charge went to the principal issue in the case, whether Omega Flex's product was defective.

or phrase in question, . . . 'substantial factor,' has a particular technical or legal meaning as established by statute or case law," and that meaning differed from the dictionary definition used by the trial court.  *Id.* at 636-38 & n.4.  In *Fleishman v. General Am. Life Ins. Co.*, 839 A.2d 1085, 1087-89 (Pa. Super. 2003), *appeal denied*, 858 A.2d 110 (Pa. 2004), we ordered a new trial because the trial court gave a definition that was incomplete.  The plaintiff had sued for breach of a disability insurance contract, but the trial court failed to give a full definition of "total disability" under the policy.  We held that a new trial was required because the charge had a "prejudicial omission of basic or fundamental information."  *Id.* (quoting trial court); *see also Gorman*, 929 A.2d at 1211-13 (new trial required because of failure to give complete instruction on factual cause).

Significantly, we have ordered a new trial in a pre-*Tincher* product liability action where the trial court failed to give a jury a definition of "defect" that was consistent with *Azzarello* and its progeny.  *See Marshall v. Philadelphia Tramrail Co.*, 626 A.2d 620, 626 (Pa. Super. 1993).  *Azzarello* instructed that a product is defective if it lacks any element needed to make it safe for its "intended use," but the trial court omitted the word "intended" from the charge.  *Marshall*, 626 A.2d at 621-24. In that case, we held that this error was "surely prejudicial," and that a new trial therefore was needed.  *Id.* at 626; *see also Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, 898 A.2d 590, 600-04 (Pa. 2006).  If an incorrect definition of "defect" under

*Azzarello* calls for a new trial, an incorrect definition of "defect" under *Tincher* should call for the same result.

We conclude that fundamental error analysis is particularly applicable here because the trial court gave a charge under law that the Supreme Court has explicitly overruled *in this very case*. Such a charge would appear to be a paradigm example of fundamental error.

In *Kuchinic v. McCrory*, 222 A.2d 897, 901 (Pa. 1966), a case arising from an air crash in Georgia, the trial court instructed the jury under Georgia law because Pennsylvania conflict-of-law principles at the time made the law of the place of the tort controlling. The Supreme Court then abandoned those conflicts principles and adopted a new conflicts scheme that made Pennsylvania law applicable to the accident. The Supreme Court held that the change in the applicable law required a new trial. *Id.* at 900-01. Similarly, in *Leland v. J. T. Baker Chem. Co.*, 423 A.2d 393 (Pa. Super. 1980), another product liability case, the jury was charged under pre-*Azzarello* law to ascertain whether "the defect [in the product] was the legal cause of an unreasonable danger." *Id.* at 395. After the jury rendered a defense verdict and the plaintiffs filed a motion for a new trial, the Supreme Court decided *Azzarello* and disapproved use of the term "unreasonably dangerous" in the jury charge. Because of that change in the law, we affirmed the trial court's grant of a new trial in *Leland*, agreeing that the plaintiff was entitled to a charge based on the change in the law. *Id.* at 396-97. In rejecting an

argument that a new trial was not warranted, we stated, "it is not inequitable to deprive appellant of a unanimous verdict which follows from a misleading instruction." *Id.* at 398.

Most recently, in *Passarello v. Grumbine*, 29 A.3d 1158 (Pa. Super. 2011), *aff'd*, 87 A.3d 285 (Pa. 2012), a medical malpractice case, both this Court and the Supreme Court held that a plaintiff was entitled to a new trial where the trial court gave a jury instruction that was at odds with a change in the law resulting from a decision of this Court rendered after the jury trial. The charge told the jury that "physicians are not liable for errors of judgment unless it's proven that an error of judgment was the result of negligence." *Passarello*, 29 A.3d at 1161. After the jury's verdict and while post-trial motions were pending, this Court decided *Pringle v. Rapaport*, 980 A.2d 159 (Pa. Super. 2009) (en banc), which held that an error-of-judgment charge is impermissible. When the trial court denied the plaintiff's motion for a new trial in *Passarello*, we reversed. We held that, under *Pringle*, the trial court in *Passarello* had given "an erroneous instruction," and that an award of a new trial was "imperative." *Passarello*, 29 A.3d at 1166, 1168. Noting that "[o]ur holding in *Pringle*, which should have been applied in this case, disavowed the very argument that counsel made," we found "the prejudice inherent in the court's error to be clear." *Id.* at 1169. In affirming, the Supreme Court held that this Court had properly "view[ed] the charge in its entirety in order to determine whether the erroneous instruction constituted

a fundamental error in the context of the whole," and that the order of a new trial therefore was appropriate. **Passarello**, 87 A.3d at 305.

Under these decisions, the trial court's erroneous jury instruction requires a new trial in the instant case. There is no question that the error was fundamental to the case. It dealt with the principal issue disputed by the parties — whether there was a defect. The record indicates that the jury asked for the charge defining a "defect" to be repeated twice, during two of its days of deliberations. We assume that a jury follows the charge that it is given, **Knowles v. Levan**, 15 A.3d 504, 508 (Pa. Super. 2011), and here the charge clearly affected the result. The Supreme Court commented that the Tinchers' case bore "the indicia of negligence." **Tincher**, 104 A.3d at 405. But after hearing the trial court's repeated instructions about the meaning of "negligence" and "defect," the jury imposed no liability on the Tinchers' negligence claims and awarded them substantial damages for the product defect. This result speaks volumes about the importance of the jury instruction on "defect" in this case. We, therefore, conclude that the charge was fundamentally erroneous and entitles Omega Flex to a new trial.

In denying Omega Flex's motion for a new trial, the trial court noted that one of the alternative definitions of a "defect" under the new **Tincher** standard is that a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. Trial Court Opinion, 3/22/16, at 4-5; **see Tincher**, 104

- 25 -

A.3d at 335. The trial court observed further that the parties presented competing evidence on the relative merits of using TracPipe instead of cast iron and on whether those merits were outweighed by the resulting risk. Therefore, in the court's view, there was no reason to try the case again because the jury already heard this type of evidence. *See* Trial Court Opinion, 3/22/16, at 5-7. We disagree.

First of all, that the jury may have heard evidence about risk and utility during the trial does not mean that it rendered a verdict based on the risk/utility standard adopted by the Supreme Court as one way to find a product defective. In fact, the verdict *could not* mean that, because the jury was never instructed to make findings under such a standard. Rather than being asked to balance risks and utilities, the jury was told only to find whether TracPipe "lacked any element necessary to make it safe" — regardless of whatever reasonable risk/utility considerations might have gone into the decision to market TracPipe without such an element.

As set forth above, the trial court said:

Speaking plainly, a product used to convey natural gas in a residential dwelling that is determined by the jury to be defective for the obvious reason that its component parts are inadequate to preclude the unanticipated escape of gas must also be considered unreasonably dangerous. This is the conclusion the jury reached in this case, and in this court's view, reasonable minds could not differ on the point. With the jury fully cognizant of the evidence [ad]duced by the parties over 7 days of trial premised upon the risk versus the utility of the two means of conveying natural gas in a home, to conclude now that the jury would have reached a different result had it been directed, as the finder of fact, to conclude that TracPipe's utility outweighed its risks, in the context

of the facts of this case, would require one to ignore the voluminous evidence the jury heard on those very issues.

*Id.* at 6-7. The trial court thus concluded that the Supreme Court's change in the definition of a product defect makes no difference in this case because the trial court is convinced that the jury would render the same verdict under whichever charge it was given. But the trial court had no authority to deny a new trial on the basis of its own speculation about what the jury would do under the Supreme Court's new formulation of the law. The trial court's declaration that the new legal reformulation resulting from the Supreme Court's thorough and extensive decision — which, it must be remembered, was rendered in response to Omega Flex's claim that it was entitled to post-trial relief, *Tincher*, 104 A.3d at 351, and that, in the end, *reversed* our affirmance of the trial court's judgment, *id.* at 410 — can cause no change to the verdict undervalues the importance of the Supreme Court's decision.[9]

---

[9] Contrary to the trial court, we draw no insight from the Supreme Court's failure to decide for itself whether Omega Flex was entitled to a new trial under its decision and from its referral of that question to the trial court for consideration on remand. At the time of the Supreme Court's decision, Omega Flex was seeking either judgment notwithstanding the verdict (JNOV) or a new trial, and the Supreme Court found that proper resolution of those alternate requests was "not apparent on the record before us." *Tincher*, 104 A.3d at 410. Omega Flex had framed its argument for JNOV and a new trial on its contention that the case should have been tried under the principles of the Third Restatement of Torts, *see id.* at 341, and, obviously, had not briefed its right to post-trial relief under the new product defect standard fashioned by the Supreme Court's *Tincher* decision. Whether Omega Flex would be entitled to JNOV under those new standards would require new briefing and a careful and complex analysis of the record, and the new trial issue normally

By basing its decision on its own view of how a jury would rule in any retrial, the trial court arrogated to itself a fact-finding role that it does not have. Under *Azzarello*, the trial court could determine whether a product is unreasonably dangerous. But if anything in the Supreme Court's *Tincher* decision is clear, it is that now only the fact-finder – in this case, the jury – may determine whether a product is defective. *See Tincher*, 104 A.3d at 335, 380-81, 407-08; *see also High v. Pennsy Supply, Inc.*, 154 A.3d 341, 347 (Pa. Super. 2017) ("the *Tincher* Court concluded that the question of whether a product is in a defective condition unreasonably dangerous to the consumer is a question of fact that should generally be reserved for the factfinder"), *petition for allowance of appeal denied*, No. 211 MAL 2017 (Pa., Sept. 26, 2017). The trial court's pronouncement that a jury on any retrial would reach the same verdict, thus disregards the requirement of factual proof and the value of jury instructions under the Supreme Court's decision. The Supreme Court said nothing in *Tincher* to suggest that mere proof of a "defect" under post-*Azzarello* strict liability law would be sufficient to prove an "unreasonably dangerous defective condition" under *Tincher*'s new formulation, and, if such proof under the old standard were all that is now

would not be reached unless it was determined that JNOV was inappropriate. In this situation, it was only natural for the Supreme Court to refer these questions to the trial court.

required to prove a defect, then one must wonder what all of the fuss regarding the Supreme Court's decision is about.[10]

The trial court appeared to rely on the Supreme Court's statement that the "question of whether a party has met its burden of proof" may properly be removed from a jury's consideration "where it is clear that reasonable minds cannot differ on the issue," *Tincher*, 104 A.3d at 407 (quoted citation and brackets omitted), but that statement was not an invitation for trial courts to re-assume a fact-finding role. The Court made clear it was referring only to a trial court's ability to decide "a dispositive motion." *See id.* at 335, 407. Here, the trial court was not deciding a motion for summary judgment or directed verdict, and there is no contention that it could do so on this record, which, according to the trial court, contains "competing evidence" on the relevant issues. *See* Trial Court Opinion, 3/22/16, at 6. To hold otherwise would deprive Omega Flex of its right to a jury trial to resolve such conflicting facts.

In effect, the trial court seemed to conclude that because it believes there is sufficient evidence in the record to support a verdict for plaintiffs

---

[10] If the trial court was opining that, even though this case was tried under a theory that focused on risks and utilities, *see Tincher*, 104 A.3d at 337-39, the record nonetheless supports a finding of a defective condition under the Supreme Court's alternative consumer expectations definition of a defect, we nonetheless remain bound by the holding that liability under that test must be established by a jury and may not be removed from its province. *See id.* at 407; *High*, 154 A.3d at 349-51.

under the new *Tincher* standards, a new trial is not required. But, as the Supreme Court specifically instructed in *Tincher* itself, that is not a proper basis for decision. The Tinchers asked the Supreme Court to forego resolving the issues presented to it because, they said, there was so much evidence supporting liability that any change in the law would not change the outcome. The Supreme Court rejected that suggestion, explaining that a verdict has meaning only in light of the charge under which it was delivered: "a trial court's charge defines the legal universe in which a jury operates for the purposes of the verdict." *Tincher*, 104 A.3d at 347 n.5. "The bare litmus of sufficiency review cannot correct a fundamental error in the instructions to lay jurors concerning just what it is that they are deciding." *Id.*, quoting *Schmidt v. Boardman Co.*, 11 A.3d 924, 944 (Pa. 2009).

The trial court's charge based on law overruled in this case was fundamental error. Omega Flex therefore is entitled to a new trial.

Judgment vacated. Order denying post-trial relief reversed. Case remanded for a new trial. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/16/18